IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MIDDLEBURG VOLUNTEER FIRE DEPARTMENT, INC., <br> Plaintiff, <br> <br> v. <br> <br> MCNEIL & COMPANY, INC., ET AL., <br> Defendants. | ) <br> ) <br> ) <br> ) Case No. 1:14-cv-458 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION

In this removed diversity insurance coverage dispute, plaintiff alleges a breach of contract claim against defendants, asserting that defendants' denial of coverage for the embezzlement of almost $500,000 by plaintiff's treasurer constitutes a breach of the insurance policy defendants issued to plaintiff. In response, defendants argue that coverage was properly denied on the basis of plaintiff's misrepresentation in the renewal survey (hereinafter "Renewal Survey") submitted to defendants in support of plaintiff's request to increase the policy's commercial crime coverage limit from $50,000 to $250,000. Defendants also contend that they are entitled to void the Policy based on the Policy's "Concealment, Misrepresentation Or Fraud" clause and the Policy's "Joint Insured" clause. Finally, defendants argue that an accord and satisfaction occurred when plaintiff cashed the $50,000 check defendants submitted for the full amount of the limit of the policy in effect prior to the renewal request. At issue, therefore, on cross-motions for summary judgment, are the following 3 questions:

(1) Whether an insurance company may void an insurance policy where, as here, an officer of the insured did not disclose his ongoing embezzling activities in response to the insured's question in the Renewal Survey as to whether there were any changes in the insured's "operations or exposures."

1

(2) Whether an insurance company may void an insurance policy based on the policy clause that allows the insurance company to void a policy when the insured intentionally conceals a material fact concerning the insurance where, as here, an officer of the insured intentionally concealed his ongoing embezzling activities and a second policy clause imputed this officer's knowledge of his embezzling activities to the insured.

(3) Whether an accord and satisfaction occurred where, as here, the insurance company sent the insured a letter and a $50,000 check indicating that the check was for the full amount of the insurance policy's pre-fraud limits, and the insured subsequently cashed the check without protest and then remained silent for a year-and-a-half before contesting defendants' coverage position.

## I.

The material facts are essentially undisputed and may be succinctly stated.[1]

- Plaintiff Middleburg Volunteer Fire Department Inc. ("Middleburg") is a volunteer organization dedicated to fighting fires in Middleburg, Virginia. Defendant McNeil & Company Inc. ("McNeil") is a New York Corporation that provides insurance programs and risk management services for emergency service organizations and other specialty markets nationwide. Defendant Arch Insurance Company ("Arch") is a Missouri corporation that is a leading insurer in the United States, and McNeil underwrites policies for Arch that fall within the parameters of McNeil's underwriting authority from Arch.[2]

- Defendants issued an insurance policy to Middleburg with policy number MEPK07344305 (hereinafter "the Policy") containing commercial crime coverage for up to $50,000.

- As relevant here, ¶ E(1)(b) of the Policy's Commercial Crime Coverage form (hereinafter "¶ E(1)(b)") states:

    [t]his insurance is void in any case of fraud by you as it relates to this insurance at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

---

[1] As required by the Scheduling Order and Local Rule 56, the parties set out their statements of undisputed facts and their responses to those statements in separately-numbered paragraphs. But both parties could not resist the temptation to include legal assertions in their responses to these paragraphs. These legal assertions are not appropriately included in the statements of undisputed facts or in the responses thereto and do not serve to create disputed issues of material fact.

[2] The parties do not dispute the existence of diversity jurisdiction in this case.

  (1) This insurance;
  (2) The property covered under this insurance;
  (3) Your interest in this insurance; or
  (4) A claim under this insurance.

- Also pertinent here, ¶ E(1)(h) of the Policy's Commercial Crime Coverage form (hereinafter "¶ E(1)(h)") reads: "[if] any insured, or partner, 'member' or officer of that insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every [i]nsured."

- On November 17, 2006, Paul Draisey, who was then an employee of the Independent Insurance Center, wrote a letter to McNeil proposing that McNeil add Middleburg as a potential insurance client. In the letter, Draisey explained that Middleburg was in his hometown, and that he had been approached about joining Middleburg as an administrative member to provide assistance in public relations and fundraising. McNeil accepted Draisey's proposal and added Middleburg as a client. McNeil then issued the Policy to Middleburg, which contained $50,000 in commercial crime coverage. Shortly thereafter, Draisey formed his own company, the Draisey Insurance Agency, which then handled Middleburg's account.

- On January 1, 2008, Draisey became Middleburg's treasurer, a position he held until April 16, 2012.

- It is undisputed that between April 23, 2009 and March 26, 2012, Draisey embezzled almost $500,000 from Middleburg. It is also uncontroverted that throughout this period in which Draisey was embezzling money from Middleburg, Middleburg's other officers and employees were unaware of Draisey's embezzling activities.

- On November 18, 2011, in the midst of his embezzling activities, Draisey, in his capacity as Middleburg's treasurer, filled out the Renewal Survey for the policy period from December 11, 2011 to December 11, 2012. One of the questions in the Renewal Survey was "whether there were any changes in the operations or exposures of the organization." Draisey responded "Yes-See Agent Notes." In the Agent Notes section, Draisey requested an increase in the Policy's commercial crime coverage limit from $50,000 to $250,000, but did not disclose that he was embezzling money from Middleburg. Draisey signed the Renewal Survey affirming that his answers were "true, accurate, and complete" to the "best of [his] knowledge and belief." Defendants granted Draisey's request to increase the Policy's commercial crime coverage limit from $50,000 to $250,000.

- In the spring of 2012, well after Draisey's submission of the Renewal Survey and the increase of the Policy's commercial crime coverage limit to $250,000, Middleburg employees began to suspect irregularities in Draisey's handling of Middleburg's finances. Subsequently, on April 16, 2012, Draisey took his own life. Shortly before his death, Draisey sent an email to Middleburg's President,

3

Bruce Gilbert, and Middleburg's Rescue Chief, Alice Love, stating in relevant part: "[t]here is a note with information on getting the $250k in coverage for my acts."

- Following Draisey's death, Middleburg submitted a claim for the Policy's commercial crime coverage limit, which was then $250,000.

- On June 4, 2012, defendants responded to Middleburg's claim for coverage by letter, stating:

  > While the Department cannot profit by Draisey's false statements to Arch, Arch has elected to rescind the increased limits sought by Draisey rather than void the [P]olicy. Under the circumstances, the full amount of the pre-fraud limits of $50,000.00 would be available to the Department. Arch has therefore enclosed a check for these policy limits.

- Enclosed with the June 4, 2012 letter was a check for $50,000 and the "in payment for" line on the check stated that it was tendered for: "[p]ayment of the limits of the policy for money stolen by an employee."

- It is undisputed that Middleburg received and deposited this check without protest.

- On November 14, 2013, almost one-and-a-half years later, Middleburg sent a letter to defendants contesting defendants' coverage position and demanding the full $250,000 in increased commercial crime coverage limit under the Policy. Defendants denied this demand.

This action was filed in Loudoun County Circuit Court and defendants subsequently removed this case on the basis of diversity jurisdiction. Thereafter, following full discovery, the parties filed and argued cross-motions for summary judgment and thus, this matter is now ripe for disposition.

## II.

The summary judgment standard is too well-settled to merit extended discussion, and the parties do not dispute this standard. Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56, Fed. R. Civ. P. It is settled that "the burden on the moving party may

4

be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). On the other hand, a genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Importantly, the party opposing summary judgment may not rest upon mere allegations and denials, and must instead "set forth specific facts showing that there is a genuine issue for trial." *Id.* And "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

### III.

Virginia law governs this case, as neither party disputes that the Policy was delivered in Middleburg, Virginia, and it is well-settled that the law of the place where an insurance contract is "delivered controls issues as to its coverage." *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993). It is also settled Virginia law that "if policy language is clear and unambiguous, [courts] do not apply rules of construction; rather, [courts] give the language its plain and ordinary meaning and enforce the policy as written." *Seabulk Offshore, Ltd. v. American Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir. 2004). On the other hand, "when the policy language is ambiguous and the intentions of the parties cannot be ascertained, the policy must be construed strictly against the insurer and liberally in favor of the insured . . . ." *Id.*

Virginia law allows an insurer to rescind a policy where it is clear that "an answer or statement . . . in the application for insurance was both (i) material to the risk assumed; and (ii) untrue." *St. Paul Fire and Marine Ins. Co. v. Jacobson*, 826 F. Supp. 155, 159 (E.D. Va. 1993) (hereinafter "*Jacobson I*"), *aff'd*, 48 F.3d 778 (4th Cir. 1995) (hereinafter "*Jacobson II*"). And

5

where, as here, the insured attests to the truth of the statements in an application for insurance to the best of the insured's knowledge, the insurance company must show that the untrue answer was "knowingly false." *Id.* (citing *Old Republic Life Ins. Co. v. Bales*, 195 S.E.2d 854, 856 (Va. 1973)). This standard is a "subjective standard, but the applicant's subjective state of mind must be reasonable in light of the objective facts." *Koger Mgmt. Group, Inc. v. Continental Cas. Co.*, No. 1:08cv301, 2009 WL 577597 at *3 (E.D. Va. 2009). Thus, for defendants to establish a valid basis to rescind the increased crime commercial limit of the Policy, they must prove that Draisey's answer "was material, that it was false, and that [he] knew the statement was false." *Id.* Each of these elements is addressed in turn.

The materiality element of a rescission claim requires proof that "truthful answers would have reasonably influenced the company's decision to issue the policy." *Commercial Underwriters Ins. Co. v. Hunt & Calderone, P.C.*, 540 S.E.2d 491, 492 (Va. 2001). In other words, if the knowledge of a fact would cause an insurer to reject the risk, or to accept the risk only at a higher premium rate, that fact is material. *See Chitwood v. Prudential Ins. Co. of America*, 143 S.E.2d 915, 919 (Va. 1965). Although conclusory statements asserting that a risk is "material" are insufficient to establish materiality, affidavits explaining why a risk is material can satisfy this element. *See Continental Cas. Co. v. Graham & Schewe*, 339 F. Supp. 2d 723, 729 (E.D. Va. 2004). Defendants did precisely this; they submitted a declaration from Victoria Brown, underwriting supervisor for McNeil, to demonstrate the materiality of Draisey's failure to disclose his embezzling activities in the Renewal Survey. There, Ms. Brown states:

> McNeil & Company Inc's standard practice [is] to refuse to renew policies where near certain claims like Draisey's are disclosed in a renewal survey . . . Indeed a claim or potential claim is central to the risk that we are assessing when deciding whether to issue or renew insurance coverages and policies, like the commercial crime coverage at issue in this matter.[3]

---

The materiality of Draisey's concealment of his embezzling activities cannot be seriously doubted. Both common sense and Ms. Brown's declaration confirm that had defendants known of Draisey's embezzling activities, they would have rejected the request for increased commercial crime limit coverage. Therefore, defendants have carried their burden of establishing the materiality of Draisey's concealment of his embezzling activities.

The next issue—whether Draisey knowingly made a false statement in the Renewal Survey—is a closer question. In determining whether a statement is false, the "[t]erms of a question in an application for insurance must be interpreted as the ordinary person standing in the shoes of the insured would understand them." *Jacobson I*, 826 F. Supp. at 159. And, as the Fourth Circuit has recognized, common sense is a powerful guide in this inquiry. *See Jacobson II*, 48 F.3d at 781. Defendants contend that Draisey made a false statement in the Renewal Survey when he failed to disclose his ongoing embezzling activities in response to a question asking whether there were any changes in Middleburg's "operations or exposures." In response, Middleburg contends that Draisey made no affirmative misrepresentation when asked about Middleburg's operations or exposures, but instead simply omitted facts which were not specifically asked of him.

The facts of this case are remarkably similar to those presented in *Jacobson*. There, a doctor was committing criminal fraud in connection with his fertility practice by inseminating patients with his own sperm rather than, as he represented to patients, sperm from anonymous donors or the patients' husbands. *See Jacobson I*, 826 F. Supp. at 158.[4] In the course of his

---

[3] Brown Decl. at 2, ¶¶ 5-7.

ongoing criminal fraudulent activity, the doctor sought insurance to cover his fertility practice and the insurance application form asked: "Do you have knowledge of any pending claims or activities (including requests for medical records) that might give rise to a claim in the future?" *Id.* The doctor responded "yes," and although he disclosed he was a named defendant in one pending lawsuit, he did not disclose his ongoing criminal fraud in his fertility practice. *Id.* On these facts, this district court held that no affirmative misrepresentation occurred because "[f]airly read, Question 39 did not require [the doctor] to disclose knowledge of any and all of his 'activities' that might conceivably spawn future legal claims. Instead, Question 39 asked about 'pending' claims which [the doctor] answered accurately." *Id.* at 159. The Fourth Circuit affirmed, noting that "it is clear under Virginia law that an insured has no affirmative duty to volunteer information; rather, an insured is only required to disclose information that is asked of him." *Jacobson II*, 48 F.3d at 780-81.

The holdings in *Jacobson I* and *Jacobson II* point persuasively to the conclusion that Draisey's answer on the Renewal Survey was not an affirmative misrepresentation. Thus, in the Renewal Survey, Draisey was asked if there were any "[c]hanges in the operations or exposures of the organization," and like the doctor in *Jacobson*, Draisey answered "[yes]." Therefore, Draisey answered the question truthfully, and, like the doctor in *Jacobson*, Draisey "cannot be deemed to have made an *affirmative* misstatement." *See Jacobson I*, 826 F. Supp. at 159. Moreover, given the ambiguity of the phrase "operations or exposures of the organization," it is far from clear that a reasonable person in Draisey's shoes would have understood this question as calling for disclosure of Draisey's embezzling activities. In short, this question is fatally

---

[4] For his crimes, the doctor was sentenced to sixty months in prison after a jury convicted him of fifty-three counts of mail fraud, wire fraud, and perjury. *See Jacobson I*, 826 F. Supp. at 158.

ambiguous; if defendants wanted more detailed information, they should have "request[ed] it more clearly." *Jacobson II*, 48 F.3d at 781.

Defendants argue that their use of the term "exposures" should have prompted Draisey to disclose his embezzlement, given his occupation as an insurance broker. This argument is unpersuasive. *Jacobson I* makes clear that the relevant inquiry is whether an *ordinary* person would have understood the question as asking for disclosure of Draisey's embezzlement. *See Jacobson I*, 826 F. Supp. at 159 (citing *MFA Mutual Ins. Co. v. Lusby*, 295 F. Supp. 660, 667 (W.D. Va. 1969)). A different result might be warranted had defendants asked a more specific and direct question—for example, "Are you aware of any ongoing or planned fraudulent or embezzling activity?" In sum, because Draisey answered defendants' question truthfully and merely omitted information that was not specifically asked of him, Draisey's answer in the Renewal Survey was not an affirmative misrepresentation. Accordingly, summary judgment in favor of defendants on this ground must be denied.

## IV.

This conclusion does not end the analysis because defendants also argue that the Policy's terms permit defendants to void the Policy. Specifically, defendants' argument is based on two Policy provisions: (i) the "Concealment, Misrepresentation Or Fraud" provision, which states:

> [t]his insurance is void in any case of fraud by you as it relates to this insurance at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:
>
> (1) This insurance;
> (2) The property covered under this insurance;
> (3) Your interest in this insurance; or
> (4) A claim under this insurance.[5]

---

[5] Policy ¶ E(1)(b).

9

and (ii) the "Joint Insured" section which reads: "[if] any insured, or partner, 'member' or officer of that insured has knowledge of any information relevant to this insurance, that knowledge is considered knowledge of every insured."[6] Given the plain language of these provisions, defendants contend that (i) Draisey's intentional concealment of his ongoing embezzling activities fits squarely within the Policy's "Concealment, Misrepresentation Or Fraud" clause—¶ E(1)(b)—and that (ii) this intentional concealment, by virtue of the "Joint Insured" clause—¶ E(1)(h)—is imputed to Middleburg thereby allowing defendants to void the Policy. Middleburg responds that Draisey's status as an insurance broker made him defendants' agent, and defendants cannot void the Policy based on misrepresentations by their agent.

To be sure, it is well-settled under Virginia law that "[a] licensed agent shall be the agent of the insurer that issued the insurance sold, solicited, or negotiated by such agent in any controversy between the insured or the beneficiary and the insurer." Va. Code § 38.2-1801. Thus, "[t]he insurance agent, within the general scope of the business he transacts, is *pro hac vice* the insurance company. What he knows they know." *Virginia Mutual Ins. Co. v. Brillhart*, 46 S.E.2d 377, 381 (Va. 1948). It follows that in the usual circumstances, an insurance company cannot void a policy on the basis of misrepresentations by its agent. This principle finds full and clear expression in the two Supreme Court of Virginia cases on which Middleburg chiefly relies. In those cases, the principle is stated as follows:

> [w]here the insured at the time of making the application, gives full, true, and correct answers, relying upon the skill, honesty, and good faith of the company's agent to fill out the application correctly, and such agent makes out the application incorrectly or inserts answers different from those given or false answers, the company cannot take advantage thereof, and **where the applicant is ignorant of the discrepancy or wrongful act of the agent, he is entitled to recover on the policy** . . . .

---

[6] *Id.*, ¶ E(1)(h).

10

*Reserve Life Ins. Co. v. Ferebee*, 118 S.E.2d 675, 678 (Va. 1961) (emphasis added). And,

> It is equally well settled that where the assured makes a full and fair disclosure of all material facts to the agent, and the latter, either through ignorance, negligence, or fraud, fails to correctly impart his knowledge to the insurance company, **and the assured is in no way at fault for the act of the agent in failing to correctly transmit the information,** then the insurance company is estopped from claiming a forfeiture of the policy.

*Sands v. Bankers' Fire Ins. Co.*, 192 S.E. 617, 621 (Va. 1937) (emphasis added).

Middleburg argues forcefully, but ultimately unpersuasively, that a straightforward application of *Ferebee* and *Sands* prevents defendants from voiding the Policy. Yet, what complicates this case and distinguishes it sharply from *Ferebee* and *Sands* is that it is undisputed that Draisey, in addition to being an insurance broker, was also Middleburg's treasurer when he filled out the Renewal Survey and intentionally concealed his embezzling activities. Draisey's intentional concealment of this clearly material fact is significant because, by the terms of the Policy, any intentional concealment by Middleburg's officers or members is imputed to Middleburg, thereby allowing defendants to void the Policy. *See* Policy ¶ E(1)(h). And significantly, the principal cases on which Middleburg relies—*Ferebee* and *Sands*—explicitly acknowledge that the usual rule that an insurer cannot rely on its agent's misrepresentation to void a policy does not operate where the insured has knowledge of a misrepresentation made with respect to the policy. *See* pp. 10-11, *supra*.[7] Here, the "you" in the "Concealment, Misrepresentation Or Fraud" provision—Policy ¶ E(1)(b)—extends to Middleburg via the "Joint Insured" or imputation clause—Policy ¶ E(1)(h)—thereby imputing to Middleburg actual

---

[7] *See also N.Y. Life Ins. Co. v. Eicher*, 93 S.E.2d 269, 272 (Va. 1956) ("[I]f an application for insurance is drawn by an agent of the insurer, who fills in false answers . . . without fraud, collusion or **actual knowledge** of the insured, or the existence of circumstances from which constructive knowledge of such falsity might be **imputed** to him, the insurer cannot rely upon the falsity of such answers in seeking to avoid liability . . . .") (emphasis added).

11

knowledge of Draisey's embezzling activities and allowing defendants to void the Policy, notwithstanding Draisey's status as an agent for both parties.

This result comports with the common sense principle that no one should be able to obtain insurance coverage to cover losses for embezzling activities they are engaging in or planning to engage in. More generally, no one should be able to obtain insurance coverage for a loss the person or entity is deliberately causing or intends to cause. To conclude otherwise converts insurance from a means by which an insured deals with risk that criminal fraud by someone would occur in the future to a guarantee of reimbursement for the insured's ongoing or planned criminal conduct. This is the antithesis of insurance. Yet, this is exactly what occurred here, as Draisey indicated in his suicide note that he was increasing the commercial crime coverage precisely to cover losses resulting from his ongoing embezzling activities.[8] Moreover, even in a situation where, as here, most of the insureds are innocent, it is still sensible to allocate the loss to the insured because "between the innocent insured and the innocent insurance company [the insured] who had the opportunity to know [the party committing the misrepresentation] best—should bear the loss." *Great American Ins. Co. v. Gross*, No. 3:05cv159, 2008 WL 376263 at *13 (E.D. Va. 2008).[9] Although Draisey was an agent for both parties, Middleburg ought to bear the loss, as Middleburg trusted Draisey enough to appoint him

---

[8] The email Draisey composed right before his death stated: "There is a note with information on getting the $250k in coverage for my acts."

[9] *See also TIG Ins. Co. v. Robertson, Cecil, King & Pruitt*, No. 1:01cv00143, 2003 WL 253167 at *4 (W.D. Va. 2003) (noting that innocent partners in law firm and the law firm's client "surely deserve our sympathy" but concluding that the "[i]nsurance [c]ompany was also innocent in its reliance on the [guilty partner's] misrepresentation . . . As among these innocent parties, it is not unjust that [the] partners—those who had the opportunity to know [the misrepresenting party] best—should bear the loss").

as its treasurer, and thus had a much greater opportunity to prevent and detect Draisey's intentional concealment than defendants, who simply dealt with Draisey as an insurance broker.

Middleburg advances several arguments, all unpersuasive, in an effort to escape this result. First, Middleburg argues that Policy ¶ E(1)(b) does not apply because defendants have not proven fraud. This argument fails as it overlooks the fact that ¶ E(1)(b) is also triggered by "intentional[] conceal[ment]" and there can be no doubt on this record that Draisey intentionally concealed his embezzling activities. Similarly unpersuasive is Middleburg's argument that if the "Joint Insured" or imputation clause—¶ E(1)(h)—is applied to void the Policy by imputing Draisey's knowledge of his embezzling activities to Middleburg, then, contrary to the parties' intent, the Policy would never cover embezzlement. This argument is wrong; the "Joint Insured" clause, properly construed, does not operate to impute a wrongdoers' knowledge of embezzlement when that embezzling activity occurs after the Policy coverage begins and the insured's agent who applied for the insurance was not aware of the embezzling activities. But, by its terms, defendants may void the Policy if, as here, the embezzling activity was ongoing at the time the Policy term commenced and the insured's officer and agent—Draisey—was the embezzler who, of course, had full knowledge of his criminal activity and indeed purchased insurance to reimburse the victim of his fraud. Nor is it persuasive to suggest that the Policy's "Joint Insured" or imputation clause should be stricken. To the contrary, a number of cases have upheld imputation clauses similar to this one.[10] Indeed, the rationale for the validity and

---

[10] *See Minn. Lawyers Mut. Ins. Co. v. Hancock*, 600 F. Supp. 2d 702, 704 (E.D. Va. 2009) ("[T]he Firm . . . specifically agreed by its acceptance of the Policy that 'the statements in the application are representations of all INSUREDS' . . . By the language of the Policy itself, therefore, [the] misrepresentations were imputed to both the Firm and [defendant]. If the Firm or its principals disagreed with this provision, they were free to bargain for different terms or to seek malpractice coverage elsewhere."); *Gross*, 2008 WL 376263 at *12 (plain reading of Policy

13

enforcement of imputation clauses like the "Joint Insured" provision is that insurance companies are "permitted to rely on the representations of [their] insured in an insurance application when reaching a determination of whether to take on a specified risk," and thus, it is logical to "impute the material facts or circumstances known to [an officer] to all the [d]irectors and [o]fficers because [the insurance company] is relying on those representations when determining whether to assume the risk of insuring and on what terms." *Gross*, 2008 WL 376363 at *13. This is therefore yet another reason defendants should not bear the loss resulting from Draisey's embezzling activities. Finally, Middleburg contends that the "adverse interest" exception prevents imputation of Draisey's knowledge to Middleburg. *See Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 771-72 (4th Cir. 1995) ("[T]he adverse interest exception permits a principal to avoid imputation when the agent's interests are sufficiently adverse to the principal's interests."). But this rule has no application where, as here, clear application of the Policy's "Joint Insured" or imputation clause applies.

In sum, because the Policy language in ¶ E(1)(b) and ¶ E(1)(h) is clear, defendants are entitled to rescind the Policy and are thus entitled to summary judgment in their favor.

## V.

Although it is unnecessary to resolve defendants' final argument regarding accord and satisfaction, this issue still merits some discussion. A threshold issue in the accord and satisfaction inquiry is whether this case is governed by Virginia common law or the Virginia commercial code negotiable instruments provision, Va. Code § 8.3A-311.

---

"impute[d] material facts or circumstances known to the person who subscribed the Proposal Form to all covered parties"). *See also Coopersville Motors, Inc. v. Federated Mut. Ins. Co.*, 771 F. Supp. 2d 796, 802 (W.D. Mich. 2011) (noting that insured's claims were barred because insured "failed to meet a condition necessary for coverage. The Policy provides that the insurance is void if the insured intentionally conceals or misrepresents a material fact").

14

Both parties' arguments are based on Va. Code § 8.3A-311, which codifies Title 3A of the Uniform Commercial Code and is limited to negotiable instruments. *See Brucato v. Ezenia! Inc.*, 351 F. Supp. 2d 464, 468 (E.D. Va. 2004) ("Virginia Code § 8.3A-311 . . . governs accord and satisfaction by use of a negotiable instrument . . . ."). While instruments must normally be payable to order or bearer in order to be negotiable, Va. Code § 8.3A-104 exempts checks from this requirement.[11] Thus, defendants' $50,000 check is negotiable and governed by Va. Code § 8.3A-311, which states that:

> [I]f a person in good faith tenders an instrument as full satisfaction of an unliquidated or disputed claim and the instrument or an accompanying written communication contains a "conspicuous statement" to the effect that the instrument is tendered in full satisfaction of the claim, the claim is discharged if the claimant obtains payment on the instrument and does not tender repayment within ninety days.

*Brucato*, 351 F. Supp. 2d at 468 (citing Va. Code § 8.3A-311).

Because an accord and satisfaction is an agreement between two parties, it requires all the essential elements of any contract, namely offer, acceptance, and consideration. *Id.* at 469. The instrument must be accompanied by a written communication containing a "conspicuous" statement that the instrument is offered in full satisfaction of the claim. *Id.* And the statute also requires that a reasonable person would have understood that the instrument was tendered in full satisfaction of the claim. *Id.* The acceptance of a check is "prima facie evidence that the check constituted 'payment in full' of the disputed amount," and thus, once the acceptance of a check is established, the burden of proof shifts to the claimant to demonstrate an accord and satisfaction

---

[11] *See* Va. Code § 8.3A-104(c) ("An order that meets all of the requirements . . . except paragraph (1) [payable to order or bearer], and otherwise falls within the definition of 'check' in subsection (f) is a negotiable instrument . . . .").

15

did not occur. *Gelles & Sons Gen. Contracting, Inc. v. Jeffrey Stack, Inc.*, 569 S.E.2d 406, 408 (Va. 2002).[12]

Thus, the relevant question is whether a reasonable person would have considered defendants' June 4, 2012 letter in conjunction with the $50,000 check as being tendered in full satisfaction of Middleburg's claim. Defendants have made out a *prima facie* case of accord and satisfaction, as they tendered a payment in good faith for full satisfaction of Middleburg's claim, despite their belief that the Policy was void. *See Brucato*, 351 F. Supp. 2d at 472-73. Defendants' letter also contained a conspicuous statement that the $50,000 was being tendered for the "full amount" of the limits of the Policy:

> While the Department cannot profit by Draisey's false statements to Arch, Arch has elected to rescind the increased limits sought by Draisey rather than void the [P]olicy. Under the circumstances, the full amount of the pre-fraud limits of $50,000.00 would be available to the Department. Arch has therefore enclosed a check for these policy limits.

Additionally, the check itself indicated that it was tendered for: "[p]ayment of the limits of the policy for money stolen by an employee." And defendants' payment was adequate consideration for Middleburg to accept the $50,000 check in full satisfaction of the disputed claim. *See Brucato*, 351 F. Supp. 2d at 473. Finally, Middleburg accepted and deposited the check, and did not tender repayment within ninety days. Indeed, Middleburg waited almost a year-and-a-half after cashing defendants' check to dispute defendants' coverage position. Thus, there is a

---

[12] Although Va. Code § 8.3A-311 largely codifies the common law doctrine of accord and satisfaction, one important difference distinguishes the statutory definition of accord and satisfaction:

> Unlike the common law, however, the statute [Va. Code § 8.3A-311], requires the claimant to overcome the presumption by satisfying an objective rather than a subjective test, that is, would a reasonable person have considered that the instrument was tendered as full satisfaction of the claim?

*Gelles & Sons*, 569 S.E.2d at 408 (internal citations omitted).

presumption that an accord and satisfaction occurred, and the burden shifts to Middleburg to rebut this presumption with record evidence.

Middleburg contends that neither the letter nor the check states clearly that the $50,000 check was in "full settlement or payment" for Middleburg's claim.[13] *See Va. Carolina Elec. Works v. Cooper*, 63 S.E.2d 717, 719 (Va. 1951). Middleburg further asserted during oral argument that its delay in disputing defendants' coverage position was due to a change in attorneys, instead of an acceptance of defendants' check as full satisfaction of Middleburg's claim. By itself, however, this does not negate the language both in the letter and on the check that would have likely put a reasonable person on notice that defendants' $50,000 check was tendered in full satisfaction of Middleburg's claim. Thus, it appears on this record that Middleburg has not overcome the presumption associated with its cashing of defendants' check that an accord and satisfaction likely occurred. Yet, in the end, because defendants are entitled to void the Policy on an alternative ground—namely, Policy ¶ E(1)(b) and ¶ E(1)(h)—the accord and satisfaction issue need not be reached or decided here.

## VI.

In sum, the record establishes that there was no affirmative misrepresentation in Draisey's response to the Renewal Survey, as the question posed to him therein was insufficiently precise to call for disclosure of Draisey's ongoing embezzling activities. Accordingly, defendants are not entitled to summary judgment on this ground. But a different result is required with respect to defendants' argument that defendants can void the Policy pursuant to ¶ E(1)(b) and ¶ E(1)(h). This is so because Draisey's intentional concealment of his

---

[13] Middleburg's position misstates Virginia law, as an accord and satisfaction under Va. Code § 8.3A-311 does not require the words "full settlement or payment" or "payment in full." Instead, the statute simply requires a conspicuous statement indicating that the instrument is tendered in full satisfaction of the disputed claim.

embezzling activities is appropriately imputed to Middleburg, and hence, defendants are entitled to summary judgment on this ground. Finally, given this result, it is unnecessary to reach or decide the accord and satisfaction issue.

An appropriate Order will issue.

Alexandria, VA
November 12, 2014

_____
T. S. Ellis, III
United States District Judge